## Case No. 1,016.

BARNES v. CHICAGO, M. & ST. P. R. CO. et al.

[8 Biss. 514;[1] 8 Reporter, 776; 11 Chi. Leg. News, 399.]

Circuit Court, E. D. Wisconsin. April Term, 1879.[2]

RAILROAD MORTGAGE — FORECLOSURE—EQUITY — PLEADING.

1. Where a railroad mortgage has been foreclosed and bought in for the benefit of the bondholders, most of whom united in organizing and carrying on a new corporation. and afterwards certain creditors by judgments subsequent to the mortgage succeeded in obtaining a decree on a bill filed to set aside the foreclosure and subject the property to payment of their judgments: *Held,* that the decree rendered the foreclosure invalid only as to the creditors who filed the bill; and the bondholders who voluntarily took stock in the new company cannot again claim under the mortgage, nor can the trustee under the mortgage maintain a new bill of foreclosure for their benefit.

[See note at end of case.]

[2. The new bill of foreclosure alleged that certain bondholders yielded under coercion to the demands of one S. and others, and exchanged their bonds for stock in the new company, believing that unless they did so they would forever lose all benefit of their security. *Held,* that the allegations were not sufficiently distinct to require a traverse.]

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed in 122 U. S. 1, 7 Sup. Ct. 1043.]

[In equity. Bill by William Barnes against the Chicago, Milwaukee & St. Paul Railroad Company and others to foreclose two mortgages executed to complainant, as trustee, by the La Crosse & Milwaukee Railroad Company upon property now in possession of respondent. The hearing is now on the sufficiency of the pleas. First plea held valid, and second invalid. A replication was afterwards filed, proofs taken, and a reference ordered. The master's report was confirmed, and the bill dismissed. On appeal this decree was affirmed by the supreme court in Barnes v. Chicago, M. & St. P. R. Co., 122 U. S. 1, 7 Sup. Ct. 1043.]

Joshua Stark, Francis Fellowes, and William Barnes, pro se, for complainant.

John W. Carey, for defendants.

DRUMMOND, Circuit Judge. This is a bill filed by the plaintiff to foreclose two mortgages, executed to him, as trustee, one in June, the other in August, 1858, by the La Crosse and Milwaukee Railroad Company, as still subsisting mortgages upon the property conveyed to secure the bonds issued under them; one mortgage was a supplement to the other.

Prior to the date of these mortgages, the railroad consisted of two divisions, called the Eastern and Western Divisions, and there were incumbrances upon the various parts of the railroad, consisting of mortgages, or deeds of trust, as well as of judgments, so that at the time the mortgages were executed to the plaintiff, there were prior incumbrances upon both divisions. This was a mortgage upon the whole railroad, from Milwaukee to La Crosse, as one entire road, subject of course to the prior incumbrances.

Under an act of the legislature of this state, the plaintiff foreclosed the mortgage, (we can speak of it as one mortgage, because the supplemental mortgage was made simply in connection with the first mortgage.) The act of February 8, 1859, (Laws Wis. 1859, c. 10, § 1,) provided that in case of the sale of a railroad in this state, by virtue of, or on foreclosure of any trust deed or mortgage, the trustee might himself bid a certain per centage on the property, and become the purchaser.

This, of course, was contrary to the general rule of law, which forbids a trustee, except under special circumstances, from becoming the purchaser under a sale made by himself.

But the second section of the law, provides, that, "The estate and title of any trustee named in such trust deed, or mortgage, acquired by purchase at such sale, shall be held in trust for the holders of such outstanding bonds, or obligations, in the same manner as if they had become the purchasers, in proportion to the amount of such bonds, or obligations, severally held by them."

The sale was made by the trustee under the authority of this act, the effect of which was that it operated only as a foreclosure of the equity of the La Crosse and Milwau-

kee R. R. Company, and paid, pro tanto on the debt due to the bondholders, the amount of the bid which was made by the trustee, and instead of holding a title subject to the equity of redemption, he became the owner and had an absolute title to the property, but still as a representative of the bondholders. The case turns upon the validity of this sale made by the trustee, and upon the effect to be given to it upon the allegations in the pleadings.

After the sale was made and the property bought in by the trustee, he and the bondholders availed themselves of another statute (Rev. St. Wis. c. 87, § 1828, par. 10) of this state, which authorized the purchaser at a railroad sale to organize a new company, and gave them the right to construct and operate a railroad, thus creating an entirely new organization springing out of the old one, and the result of the sale that was made.

Accordingly, the trustee and the bondholders under the trust deed of 1858, availing themselves of this act of the legislature, proceeded to organize themselves into a new company, known as the "Milwaukee and Minnesota Railroad Company," and formed a new organization, and as such operated some portions of the road, and it was treated by all parties and by the courts, including the supreme court of the United States, as a duly organized company, clothed with all the rights, franchises and privileges of a railroad corporation, under the laws of the state of Wisconsin.

Sometime [it is not necessary to be particular about dates] [3] after this took place, certain creditors of the La Crosse Company, obtaining judgments after the date of the mortgage of 1858, filed a bill in the circuit court of the United States, for the district of Wisconsin, alleging that the sale made by the trustee under the act of the legislature of 1859, was fraudulent and void as against them.

A decree dismissing the bill was rendered by the circuit court, [unreported,] and an appeal taken to the supreme court of the United States, where the decree of the lower court was reversed, and the sale made by the trustee was adjudged fraudulent and void, and the case remanded to the circuit court, with instructions to enter a decree in the case in conformity with the opinion of that court. James v. Milwaukee & M. R. Co., 6 Wall. [73 U. S.] 752. A decree was accordingly entered declaring the sale fraudulent and void as against the judgment creditors; and also, declaring at the same time, in conformity with the opinion of the supreme court, that the mortgage was to remain as a valid security for the benefit of those who were bona fide holders of bonds under the mortgage, the amount being less than two hundred thousand dollars, although the amount claimed as due, and for which the

property was sold by the trustee, was a much larger sum.

The supreme court found that a large number of the bonds were fraudulent and void, and for that reason set aside the sale. James v. Milwaukee & M. R. Co., 6 Wall. [73 U. S.] 752. It is because the supreme court rendered this decree, setting aside the sale, that the bill has been filed by the trustee in this case, alleging that the mortgage is in full force, and that he has a right to come in and ask for a foreclosure of it, and to redeem from any prior liens that may exist against the property mortgaged, after proper deductions are made in consequence of the rents and profits which have been received by the parties who hold the property, from the operation of the road and otherwise. As I have said, the Milwaukee and Minnesota Company, operating portions of road, was treated as a corporation, with all its franchises and privileges, and in the proceedings which took place afterwards for the purpose of foreclosing incumbrances upon the property, prior to the date of the plaintiff's mortgage, the Minnesota Company was considered as representing the plaintiff and the bondholders under the mortgage of 1858, and was made a party to all the proceedings which subsequently took place, how numerous soever they were, where it was necessary that a subsequent incumbrancer should be made a party.

The Minnesota Company being thus treated, and regarding itself as clothed with all the muniments and privileges arising from this sale, was called upon at one time to pay a large sum of money, in order to redeem the property from an incumbrance which was upon it, and under the order of the court, paid over four hundred thousand dollars.

This was done before the decree of the supreme court declaring the sale fraudulent and void. After the decision of the supreme court, in James v. Milwaukee & M. R. Co., supra, the Minnesota Company filed a bill for the purpose of having the money which had thus been paid, restored to it, on the ground that as a company it was destroyed by the decree of the supreme court, and that the money had been paid through mistake, and therefore it was entitled to recover it back.

A demurrer was put in to the bill filed in the circuit court of the United States, and the demurrer was sustained and the case taken to the supreme court, and the decree of the lower court was affirmed, the supreme court holding that the Minnesota company could not recover the money back. Milwaukee & M. R. Co. v. Soutter, 13 Wall. [80 U. S.] 517. It is mainly in consequence of these supposed to be conflicting opinions of the supreme court of the United States, that the controversy arises in this case. It is claimed on the part of the plaintiff, that the sale made by the trustee was an absolute nullity as to all the world—that it was the execution of a power in a way not authorized

3 [From 11 Chi. Leg. News, 399.]

by the mortgage, and therefore was absolutely void, being in violation of the constitution of the United States, as the law of 1859, passed by the legislature of this state, impaired the obligation of the contract.

It is, perhaps, not necessary, in the view which the court takes of the case, to decide this last question.

I have said that the only effect of the sale was to foreclose the equity of redemption of the La Crosse and Milwaukee Railroad Company, and to pay pro tanto the amount of the debt owing by that company, to the extent of the bid made by the trustee. The trustee and the bondholders had the property which was covered by the mortgage. The sale had no other effect than that indicated.

They were left with an absolute title to the property, instead of having a title subject to the equity of redemption. And it is to be observed that the La Crosse Company has never made any complaint whatever in regard to the sale. No objection has been interposed by it so far as we know, during the twenty years since the sale, and nothing shows in any way dissatisfaction on the part of the La Crosse Company to the mode of foreclosing the mortgage, but it seems to have acquiesced in the proceeding.

These being allegations that appear in the bill, the defendants come in and allege by plea, that upon the sale which was made, the reorganization of the Minnesota Company took place and that the bondholders—all the bondholders—under the mortgage, relinquished their bonds, as they were authorized to do by statute, and took stock of the Minnesota Company in their place, and so that whatever view may be taken of the effect of the sale under some aspects, it was only invalid as against the judgment creditors who filed that bill; that it stood for all other purposes, and that it was entirely competent for the trustee and the bondholders, both agreeing to it, to convert the bonds into the stock of the Minnesota Company; that no one has a right to complain, not even the trustee, and consequently that the Minnesota Company was the proper representative of the trustee and the bondholders, in the litigation which took place in so many forms afterwards; and we think that is a sound position, if the facts are as stated.

If true, however irregularly the sale may have been made by the trustee, however fraudulent it may have been as against the judgment creditors who filed the bill, still, if the bondholders have voluntarily converted their bonds into stock, it is not competent for the trustee to file this bill. The supreme court of the United States declared in its opinion,—James v. Milwaukee & M. R. Co., [6 Wall. (73 U. S.) 752,] (and the decree of this court conformed to that opinion,) that the mortgage stood as a valid surety for the benefit of the bona fide bondholders; and therefore I think that neither the act of the legislature nor of the trustee,

nor the conversion of their bonds into stock by a majority of the bondholders, nor the fact that the trustee transferred all his interest to the Minnesota Company, impaired the validity of the bonds which were held by other parties who did not assent (if any did not assent) to this purchase, and who did not convert their bonds into stock. But it is to be observed, the plea alleges that they all did convert their bonds into stock, and so we hold that, if that be true, it is a valid answer to this bill, for the reasons already stated.

And we hold that the action of the supreme court and of the circuit court for the district of Wisconsin, in setting aside the sale by the trustee, had no other effect than to render it invalid as against the judgment creditors, and consequently if the bondholders all came in and converted their bonds into stock, that put an end to the mortgage.

That seems to be the opinion of the supreme court of the United States, in the case of the Milwaukee & M. R. Co. v. Soutter, [13 Wall. (80 U. S.) 517.]

The ground taken in the argument of that case by the counsel was, that the opinion of the supreme court and the decree of the circuit court following it, rendered the whole sale absolutely inoperative as to all persons, and that the Minnesota company had acquired no right, title or interest, by virtue of what had taken place.

The court said, that "the complainants (the Minnesota company,) are wrong in asserting that the property was not theirs (under the sale.) It was theirs. Their purchase was declared (in James v. Milwaukee & M. R. Co., [supra,]) void only as against the creditors of the La Crosse & Milwaukee Railroad Company.

"In other words, it was only voidable, not absolutely void. By satisfying these creditors they could have kept the property, and their title would have been good as against all the world. The property was theirs; but by reason of the fraudulent sale, it was subject to the incumbrance of the debts of the La Crosse Company. This was the legal effect of the decree declaring their title void. Therefore, they were, in fact, paying off an incumbrance on their own property, when they paid into court the money which they are now seeking to recover back.

"They are wrong also in asserting that they made the payment under a mistake of fact. If it was made under any mistake at all, it was clearly a mistake of law."

So that there is an opinion of the supreme court of the United States, declaring what was the legal effect of the sale, which that court declared to be inoperative and void in [James v. Milwaukee & M. R. Co., supra.]

[4] [The remaining question is whether or not the plaintiff, by proper allegations in the bill, has impaired the effect of the statement

---

[4] [From 11 Chi. Leg. News, 399.]

contained in the plea. In other words, has it confessed what is stated in the plea, and, by proper allegations in the bill, avoided it, so as to show that the plea is not a valid plea? There are certain statements in the bill, to the effect that some of the bondholders did not relinquish their bonds and take stock of the Minnesota Company, and, so far as those averments are concerned, it must be considered that the statement of the plea is a traverse of the allegations. The plea states that all did convert their bonds into stock. But there is an attempt on the part of the pleader to get rid of the fact which he admits; that some of the bondholders, and, as it is conceded a very large majority, did surrender their bonds and take stock; and it is claimed it is shown that these bondholders, or some of them, who surrendered their bonds and took stock, were laboring under coercion.

[I will read two paragraphs in the bill, in order that we may clearly understand the allegations upon this subject: "And your orator saith, that from and after the said sale and organization, so called, Russell Sage and others, (but who "the others" are, is not stated,) professing to be, and acting as, officers and directors of the said Minnesota Company, had, or claimed to have, entire control and possession of the estate conveyed to him as aforesaid for the security of the said third mortgage bonds, subject to all the legal liens thereon, and excluded the holders of said bonds who had not subscribed said articles of organization, referring to the articles of organization of the Milwaukee & Minnesota Company, and surrendered their bonds, and paid their pro rata share of the expenses aforesaid, from all enjoyment of said estate, or of the fruits thereof, and from all participation in said company as stockholders or otherwise, and demanded that they should surrender their bonds to said company in exchange for capital stock thereof, and pay their said pro rata share, and threatened and declared that unless they should do so they should forfeit all right to said estate as security for said bonds, and be forever debarred from participation in the fruits of said sale supposed to have been made by your orator to said Minnesota Company, and from all benefit to be derived therefrom." "And your orator saith, upon information and belief, that sundry holders of said bonds, supposing and believing that unless they surrendered their bonds as required by the said Sage and others, and paid their said pro rata share, they would forever lose all benefit to be derived from said estate as security, yielded to the demands of said Sage and others, and surrendered their bonds in exchange for capital stock of said supposed company, and paid their said pro rata share of expenses, who otherwise would not have done so, and that in so doing said bondholders acted under coercion on the part of said Sage and others, and now insist, and

your orator avers, that by reason of said coercion, and by reason of the facts aforesaid, their title to said bonds and to said estate conveyed to your orator as security therefor. remains unimpaired, and that in equity they are entitled to demand and receive payment of said bonds, and to have said security applied thereto." These are the only allegations in the bill upon this subject, and the question is whether they are sufficiently distinct and of such a character as to warrant the court in saying that the defendants are called upon to traverse them; and we think that they are not.

[It is to be observed that no man's name is mentioned except that of Mr. Sage. Now why should the threats of Mr. Sage affect the rights of other parties, who had nothing to do with them, who had no knowledge of them, and who did not participate in them in any way? It is not stated how many of these bondholders acted under these threats. It says only: "sundry holders of said bonds." If Mr. Sage made these threats, they could have no binding effect upon the bondholders, It was a simple opinion of his. It did not affect, in the slightest degree, the legal or equitable rights of the bondholders. What Mr. Sage said could not deprive them of any of their equities under the mortgage, and it does not necessarily follow, that because he may have used this language, that they did not of their own free will, and after a proper examination of the case, voluntarily surrender their bonds and take the stock. It is to be observed, that this took place before the supreme court had decided upon the effect of the sale. All parties I presume, certainly the trustee, acted in good faith, although he has now filed this bill. He asserts that he acted in good faith. under the authority of the act of the legislature, and under the instructions of the best legal advice. No doubt they all acted in good faith, even if Mr. Sage did not. If he did use threats, was the coercion here used of such a character, and are the allegations so specified that we can say there was a certain number of the bondholders who were compelled by the threats of Sage to surrender their bonds and take stock?

[Other persons besides Sage are interested in the sale, and in the property, and are to be affected by the bill that is filed in this case. They have become owners of the property as the result of the litigation which has been so long continued, and under the decrees which have been so often made. They hold under sales that have been made in foreclosure proceedings under mortgages and judgments, which confessedly were prior liens to the mortgage of the plaintiff of 1858. Under these proceedings the Minnesota Company was a party, and was assumed to represent Mr. Barnes and the bondholders under the mortgage, and those who acquired the property, it is presumed, acquired it in good faith. Mr. Sage is not the only one of

them. There were many others interested in it. And, therefore, upon this allegation, loose, vague and indefinite, about coercion in consequence of something that might have been stated by Mr. Sage, we do not think that we can hold that it is sufficient to bind the parties to this bill. But it will be observed that the supreme court of the United States, in the case already referred to,—Milwaukee & M. R. Co. v. Soutter, [13 Wall. (80 U. S.) 517,] seems to have had its attention called to a state of facts somewhat similar to what is alleged here. The court says, in that case, "It is stated that Russell Sage, one of the defendants, who received a large portion of the money paid into court, was also a large holder of bonds under the Barnes mortgages, and advised and encouraged the sale by Barnes, and participated in the organization of the complainant's company (the Minnesota Company); all these facts may be true, but they do not show, nor is it alleged that Sage was personally a participant in the fraud which was committed in the sale under the Barnes mortgage." Nor does this bill make any such allegations.] [5]

We shall, therefore, without going further into the case, hold, that the first plea is a valid plea to this bill.

But we do not, in so holding, intend to foreclose the rights of any of the bondholders, either those who did not surrender their bonds and take stock, or those who did surrender their bonds and take stock, under the plan to organize the Milwaukee and Minnesota Railroad Company.

Of course it is a question of fact, whether or not they did surrender their bonds and take stock.

[We think that the true construction of this plea is, that they voluntarily—that is, in a legal sense—surrendered their bonds and took stock; that unless it was a voluntary act, it was not binding upon them.] [5]

And we think, as stated before, that those who did not surrender their bonds and take stock, if there are any such, were not bound by what occurred, and that this mortgage is valid as to all such bondholders.

[It will be a question to be determined upon a reference and proofs, whether or not the bonds that have been surrendered, as it is admitted much the greater portion of them have been surrendered, so that they are bound by the surrender. And it will also be a question how many of the bondholders have not surrendered their bonds; and whether or not they are bona fide holders of the bonds. The first plea will be held to be a valid plea, and the second as not being sufficiently full and explicit, invalid, and it will be ordered accordingly.] [5]

DYER, District Judge, concurring.

[NOTE. The supreme court affirmed the foregoing decision on the ground that the bond-

holders consented to the action of the trustee in their behalf, and that it was immaterial that some omitted to surrender their bonds for cancellation. As to the bonds not actually surrendered and exchanged for stock, Mr. Chief Justice Waite says: "We have no hesitation in deciding that, at the time of the foreclosure, they were held and owned by parties who in law consented thereto, and that the present holders took them with full notice of that fact. * * * Under these circumstances. we cannot do otherwise than decide that the silence of the holders of these few bonds, during all the time the Minnesota Company was acting in their behalf, is equivalent to actual consent to the sale under which the company got the right to represent their interests in the litigation with the prior lienholders. They are the only persons, so far as the record discloses, who did not actually surrender their bonds, and take certificates of stock therefor, and it is now too late for them to say that what their trustee did in their behalf was without authority." Barnes v. Chicago, M. & St. P. R. Co., 122 U. S. 1, 7 Sup. Ct. 1048.]